United States v. Roopnarine. Did I pronounce it correctly? Case number 16-15025. Ms. Golder. Good morning. I represented Mr. Roopnarine at trial and, of course, also on appeal. And I have to say, this is probably the most issues I've ever had on an appeal. I'm looking at six issues. So I'll try to go through them quickly. And whatever drew the Court's focus, please, you know, let me know. Well, you know, you keep all of the issues you've briefed. So if you want to focus on some and not others, that's perfectly fine, too. But it's your choice. Yes, I'm going to try to do that. I'm going to start with sufficiency of the evidence and really focus on the substantive counts. Because never before have I been in a trial where the only proof of a substantive count is buried in a file somewhere that nobody ever talked about in trial and nobody ever testified to. So when you're looking at sufficiency of the evidence, count three concerned a wire transfer of $171,000. There was absolutely no testimony. Nobody ever mentioned this transaction in trial. The first time we hear about it is buried in a bunch of business records that were moved into trial. There is a sheet that shows a wire transfer. That's it. That's your only proof of that count. The jury had those exhibits, didn't they? So they had evidence of the wire transfer. Isn't that right? Yeah. Well, the wire transfer may have happened, but in connection with what? And where's the fraud? Where's the proof that that wire transfer had anything to do with a fraudulent transaction? Because nobody specifically discussed that property or why that wire transfer was made. Or what the purpose of the wire transfer. So there's no testimony in the record at all. All you have is a document showing a wire transfer was made. And I- Was the wire transfer in connection with money that was given to a straw borrower who ended up seeking a loan on a piece of property and that that was not disclosed to the lender? No. No. In fact, we would all be speculating as to the purpose of the wire transfer, but the wire transfer was between a bank and a title company. That's all we know about it. Does it reference a person, a borrower, a loan number, or anything like that? Or is just a sheet of paper that says going from one to another? Correct. The latter. It's just a sheet of paper showing money going from the bank to the title company. Was that piece of paper in a loan file? I believe it was. Either in the title company's file or the bank's file. Related to a specific loan, correct? Yes. Relating to a specific transaction. Not one of the transactions discussed by any of the witnesses. The government exhibit 3A, which is the incoming wire detail, says originator to beneficiary info and it lists Mr. Hossain's name. As to that wire? Yes. Didn't he testify about it? I thought he testified about that wire detail. It's $169,778.80. That's a different wire. That's a different wire transfer. This is $171,000 in Count 3. We had the same kind of situation in Count 6, which is it alleges the Miami-Dade clerk received a UPS delivery from ascendant title of a mortgage indeed. Once again, there's no testimony. All we have is there's a real estate file admitted into evidence, and in that file there is a receipt that somebody mailed documents. But there's no testimony from the clerk. There's no clerk's records. The receipt itself doesn't say what documents were mailed. And nobody testified about this transaction. So it's the same sort of thing where there's a document, a piece of paper hidden in a file. The file's moved in, wholesale is a business record, and nobody ever talks about it. There was no testimony about what was mailed? No. There's no testimony at all. They pull out the sheet of paper in closing and say, hey, this is what this is. That's your evidence. Frankly, what went on at sentencing isn't much different than this. But we had a lot, this kind of is what went on in the trial. There's just not proof. Did you object to the introduction of these files in which you contend that these wire transfer documents were hidden? No, they were admitted as business records, and they are business records. They were records of the bank or records of the title company admitted as business records. And they had the affidavits to admit them. So couldn't a jury go through those and piece together the history of these transactions, including where the wires or the transfers using commercial carriers came in, and therefore isn't the evidence sufficient to withstand the conviction? Maybe in the 45 minutes they were out, they could have, but I don't think they did. But you don't know, do you? Where's the evidence of fraud? Where are we getting fraud in this transaction? Well, but the transaction doesn't have to be fraudulent, right? You can have a mailing that is a substantive wire or mail fraud charge that in and of itself is not fraudulent. It's that you're using the mails or the wires in furtherance of a fraudulent scheme. Is that not the way the statutory scheme works? Yes, so where is the proof that that wire or that that mailing receipt was done in connection with some fraud? I agree with you. The mailing itself isn't fraudulent. But where is testimony that those two events took place in connection with a fraud? You'd need someone to testify about the transaction. And there's no testimony about it. Likewise, another issue I raised here concerned two jury instructions. A Pinkerton instruction and a deliberate ignorance instruction, both of which I claimed undermined the intent to defraud. Because first of all, with deliberate ignorance, nobody was, there's no evidence of deliberate ignorance in this case. The claim all along is that Mr. Rootnarine had actual knowledge, he's the mastermind of this scheme, and he knew everything that was going on. So there's no testimony that supports the giving of a deliberate ignorance instruction. What the government was hoping to argue, and fortunately I picked up on it and brought it up to the judge and he prevented them. They wanted to argue that because they put these witnesses on, Dolly Balkasoon, Kamalaseet Charan, Mr. Hussain, Mr. Khan, people who had pled guilty to the frauds in this case. They wanted the jury to draw the conclusion that those people pled guilty to fraud and therefore Mr. Rootnarine has to be guilty of the fraud as well. Because they've already been pled and convicted of the fraud, so he must be guilty of the fraud. That's the connection they wanted the jury to draw. When they started saying something that picked up on that, I drew it to the judge's attention and he said, well, they're not going to be allowed to argue that. Are you going to intend to argue that? And the government says, well, I guess we won't now, judge, now that you told us we can. These instructions were intended to lead the jury in that direction. To say, we don't care if Mr. Rootnarine had an intent to defraud. And keep in mind, the whole defense was built on lack of intent to defraud. That he put together this business plan, and we argue it's a bad business plan. But it wasn't intended to defraud, and that was never his intent. He was very open in presentations, in meetings with undercover agents about exactly how this all worked, frankly. We know that, but it's, I mean, my understanding of the evidence at the trial was that he knew that borrowers were going to apply for loans, that he provided funding for them to make a down payment. And that they did, in fact, apply for loans, not having any personal funds in the transactions. And that those then were presented to lenders as if the person applying for the loan was indeed the person who, in fact, was going to be responsible for the property. But I think what you said is that Mr. Rootnarine, the contention was that he knew that that's what the scheme was. And that he knew that lenders were going to be misled with respect to who was actually applying for the loan. Actually, his position was it didn't matter who was putting up the money because this particular type of loan, the only thing the lender looked to was the credit score. I know, but the law is pretty well established that it's not the lender's responsibility to determine what it is that they're going to look at. That they have a right to rely upon the submission of information that's true. And that Mr. Rootnarine knew that it wasn't. I disagree that that's what the law requires. When we get into materiality, I think it needs to be something that's material to the loan. For us to sit here and say lenders have absolutely no responsibility for the money they lend, that you can submit anything to them and they have absolutely no obligation to check anything, do anything, or perform any kind of analysis in making these loans. There are courts that have said, no, that's reckless conduct on the part of the bank. Not negligent, but reckless. And that is not what we are going to allow our banks to do. In this particular case, they were paying higher interest rates to get what they called low-document loans. Which meant the only thing the bank cared about was the credit score. And when you looked at Mr. Rootnarine's- I looked for that evidence that the bank only cared about the credit score, and I couldn't find that in the record. Mr. Kadena admitted to that in his testimony. I didn't see where he did. Can you give me a cite for that? You don't have to read it to me in the time you have remaining, but just let me have the cite. Yeah, because I'm sure it's in my brief. Where, when I discuss Mr. Kadena's testimony. He talked about that even though it was stated income, that wasn't licensed to misrepresent your income. It wasn't stated- Stated income and assets. It was that type of loan. No, well, okay. In other words, they weren't going to check on any of that. Right, but Mr. Kadena said you still can't lie about that. That is what Mr. Kadena said. But is he really in a position to testify to that? And that was part of our issue with him. He didn't do- But he didn't say the bank relied only on the credit scores. I couldn't find that in his testimony. I'm pretty sure he did. I'm looking at page- Well, anyway. If you can find it, you can bring that up in rebuttal. Thank you. It's in the brief. And there was other testimony. I think Cam LaCetrian testified also to the fact that these loans were based on credit scores. And that's why the spreadsheets she provided to Mr. Roopnarain dealt only with credit scores. That's the only information they had on there, not income or anything else. And so the thought was these other numbers really didn't matter. And I think what she was doing, frankly, was if she didn't have the information, she just put something in because she figured it didn't matter anyway. Because that's not what the bank was looking at. The bank was looking at the credit score. And that's what these loans were based on. I only have less than two minutes left, so- You're over two, and we've taken you over the two. Oh, I apologize. No, no. No need to apologize. If you want to eat into your rebuttal, you can. If not, you'll have your full five left. Okay. Well, just so it is rebuttal. The only two other issues I really want to draw the Court's attention to, well, three that I consider major were, first of all, failing to disclose the identity of the agent. Just because somebody's an undercover agent doesn't mean that that's sufficient basis to fail to disclose who they are. And I think the case law is overwhelming in that regard. I've given you the cases in my brief in that issue. Also, as to fraud loss, there was no evidence presented. There's Mr. Childers and his spreadsheets with no documentation to back up his spreadsheets. And in cross of him, I pointed out numerous discrepancies and inconsistencies, which are laid out in my brief, as to why his spreadsheets were inaccurate and they overstated the amount of the fraud loss. There's also a two-level- But there, didn't the pre-sentence investigation report indicate that there were over $40-odd million in loans and that 20-something million of those loans remained unpaid? The only information that the probation officer had was based on Mr. Childers' spreadsheets. And the government conceded that at sentencing. That the only information the government presented to probation and the only information they had was Mr. Childers' spreadsheets. Well, there were 181 homes, 80 straw buyers, and the loans totaled $46 million. That was largely undisputed, right? Right. So the question is, how much the bank suffered and lost from those $46 million in loans? Correct. Okay. And that's where we got into fair market value versus some of these, you know, were distressed properties. Some of them were tax certificates. And that value was used. And therefore, you know, it was like one was a $7,900 tax certificate. And that was used to account for how much the bank actually got. When, in fact, these were properties that were being flipped, that were being sold at a discount by the banks. And no accountability for the actual loss. All right. Thank you, Ms. Golder. You have three minutes left for rebuttal. Mr. DeRosa. May it please the court, Philip DeRosa on behalf of the United States. The government proved fraud in this case by both direct and circumstantial evidence. And of course, fraud is, that's the beating heart of any fraud case. The beating heart of the fraud is the misrepresentations and lies to the bank that people tell to try to make the bank part with its money. And in this case, counts three and six. The substantive counts were the two fraud counts. And Government Exhibit 3 was all of the loan documents that pertain to a particular house, Northeast 26th Place in Homestead, Unit 102. Government Exhibit 6 was all the documents that pertain to another house, which was Northeast 4th Street Homestead, Unit 205. Iskramul Hossain testified as to both those houses. He was the straw buyer. He authenticated all the documents in Government Exhibit 3 and Government Exhibit 6. He said, these documents are everything that I originated in connection with the loans that were fraudulent. So, I mean, this is very clear from my brief. I just, I'm aghast that there's being representations made that there was no evidence, there was no testimony because Hossain was the witness who testified about these transactions. Well, let's talk about one of them. I think a document in a loan file with a wire transfer, the chances are pretty good that you can trace that wire to the loan and you can explain circumstantially or directly why that loan or that wire transfer was in furtherance of fraud. So I don't think you have any issues there and I speak only for myself. But Ms. Golder says that with regards to one of the substantive counts, which was based on a UPS mailing to the clerk of court, that there was no testimony concerning what was mailed. Is that contention correct? I don't think so. What was mailed? What was mailed was a deed, some form of deed to the county appraiser's office. That deed had HUD 1 and the uniform residential loan application attached to it. So it was clear from, I think it was a fax or a letter to the county court saying, this is the documentation in connection with this property. And it says on it, received by mail. And of course, like I said, Hossain authenticated those documents. He said, these are the documents that I originated in connection with this transaction. So it's not like the jury had to- He mailed it or somebody else mailed it? Somebody else mailed it. How could he authenticate it then? Because he's the one, there were his documents for that house that he bought. He bought at least two houses from Roopnarine. One was the subject of count three. One was the subject of count six. The count three documents involved a wire transfer of money to a closing agent. The documents in count six involved a document that was mailed to the county appraiser's office concerning the property that he bought. In connection with those two loans, was there any objection to the admission of that evidence at the trial? No, Your Honor, because like Ms. Golder said, these were business records. But to say that there was nobody who testified about these documents, that's sorely misconceived because Hossain testified. And let me just give, I want to give a quick summary of the loan application process because I want to be clear about what the government proved with respect to the fraud. Every loan application process consists of two primary sets of documents. The HUD-1, which is a government form, settlement statement, itemizes the cost to the borrower. Okay? The evidence, the HUD-1 contains one of the biggest and most material lies in this case, and that's cash from borrower. And Hossain testified, this is the HUD-1 for my transactions. I didn't put down this cash from borrower, even though it says it on the HUD-1. Roopnarine put down the cash down payment on my behalf. And the evidence showed that in every case, Roopnarine reviewed the HUD-1s. Now remember, the HUD-1s is part of the loan application process because the bank, and this is DE-359 at 64, the bank looks at the HUD-1s to make its loan decision. So that's a material document to the bank. All the HUD-1s have cash from borrower on it. That's a lie in every case because Roopnarine has already told the straw buyers, don't worry about the cash to close. I'll put that down for you. On that basis alone, the fact that Roopnarine reviewed the HUD-1s for every transaction in this case, that's how he got his little chart, his little colored chart with all his figures on it. He got that information from the HUD-1s, which he reviewed in every case. On that basis alone, this evidence was sufficient to prove his fraud. As far as the second set of documents that's material in every mortgage loan application, it's the Uniform Residential Loan Application. It's another standard government form, Fannie Mae 1003. The government proved the Uniform Residential Loan Applications by circumstantial evidence because there was no direct evidence that Roopnarine actually reviewed the Uniform Residential Loan Applications. What he did, according to Kamla Cichron, was he hired people to be processors. He hired a bunch of young women who worked for Century Star. He paid them $1,000 a week. They processed the Uniform Residential Loan Applications. But as Hossain testified, all I gave him was my Social Security number and credit score. I never gave anybody any other information, and yet I'm looking at this Uniform Resource Loan Application. It says my income for the month was $15,000 a month. That's not true. My cash to close, which is also on that, $29,000, that's not true. My liquid assets, $87,000, that's not true. Nobody asked me about that, but yet it ended up on the Uniform Residential Loan Applications. What's the government's argument as to the appropriateness of the deliberate indifference charge? I'm pretty sure in my consideration that the government put that in because as to the two substantive counts, there's no direct evidence that Rup Noreen reviewed the Uniform Residential Loan Applications. He let other people do that for him, even though he ran the operation and everybody reported to him, took their direction from him. There was no evidence that he actually reviewed the Uniform Residential Loan Applications with those material lies on it. Was your theory that in the charge conference that the government was permitted to say there are two parts of these transactions, one of which we believe he knew about and one of which we believe he didn't care about? More than that, there was evidence that he did not want his name on any of the corporation documents for the companies that he ran so that he could later say, I had nothing to do with this. This was all done without my knowledge by the people that worked for me. Well, that's deliberate ignorance. If you're going to say I'm not guilty of the substantive counts because other people did it and I wasn't there and you have proof that he told people don't put my name on the corporate documents, that raises an argument that he deliberately closed his eyes to the wrongdoings of the people that worked for him. But again, to me this is an academic argument because it doesn't matter. The law, your law, the Eleventh Circuit law says that if you have evidence of actual knowledge, which you did in this case, and if the court properly instructs on it, then it doesn't matter if the court also instructed on deliberate ignorance because that's harmless error. But that's the whole problem, Mr. De Rosa, that if our view is that it's always harmless, then you always give a deliberate ignorance instruction no matter what the circumstances, and that can't be right. Correct? It can't be that the giving of a deliberate ignorance instruction is okay because it's always harmless error. That can't be the reason. I think that presumes that there's some evidence to give the deliberate ignorance instruction, and what I'm arguing is there was evidence. The judge didn't improperly give the instruction because there was evidence that he deliberately closed his eyes to crimes that were committed by the people that worked for him. But wasn't he giving the cash to borrower, as you said? How could he not know? Well, I mean that's just one of the material lies, cash to borrower. You said it was one of the critical lies. Yes. But if he knew that because he was the one providing the cash, how could it be deliberate ignorance as opposed to actual knowledge? Well, you're talking about one material lie. I mean, if that's where it stops, fine. We win. But we had other things as well. We had other material lies that we put on evidence of, and those weren't so clear. Like I said, those were based on circumstantial evidence, the lies surrounding the uniform residential loan applications. As to those, it seems to me that the deliberate ignorance instruction was appropriate, not necessarily to the lie about cash from borrower on the HUD-1s, because that was proved by direct evidence. No, please, go ahead. Just going back to having applied for loans on my own on property that we've bought, usually the application is what starts the process, and you submit that to the lender. And then it's the HUD-1 is prepared in connection with the closing. So what you're saying is there are two events. One event is the applications, which he allowed to go forward, even though he was providing the down payment and didn't care much about them, because he knew that he had to have that predicate to the process, but that he did know what was on the HUD-1. I'm saying that the HUD-1 is also part of the loan application process, and that's why I gave you the site DE-359 at 64. The testimony shows that the lender reviews the HUD-1 before making a decision whether or not to disperse any money to the borrower. So the uniform residential loan application is not the only set of documents that's necessary to a real estate transaction, and it's not the only set of documents that the lender looks at before deciding whether or not to lend money. No, I understand that, but if a lender got an application that disclosed that I'm a borrower, but I don't intend to put any of my own money in, the money that's being put in is by a friend of mine who's given it to me, a bank could well say, we don't do that. We're not going to process this application, because the processing at a later date includes the HUD-1. Yeah, I mean, we proved that. Kadena testified, even though he didn't approve Hossain's loans himself personally, he worked at the same bank, he was an underwriter, and he testified that this is the kind of things banks look at. We look at stated income, we look at liquid assets, we look at cash to borrower. The only thing is, is with the uniform residential loan applications, the government didn't have the direct evidence that Roopnarine knew what was on there, as opposed to the HUD-1s. So that made our case a little harder. I think I've gotten lost in... I'm not answering your question. I'm sorry about that, Your Honor. Well, I'm going to go to a different question. I'm not saying that I was lost. I would never admit that. I got lost. This is just from a district court perspective. Why did the government not want to disclose the undercover agent's name? Well, the government's stated reason in its motion in Lemonet was twofold. One, we have security concerns. I don't really know what kind of security concerns you can have in a mortgage fraud case. I thought the better reason was that we have ongoing... These agents are involved in ongoing investigations that will be compromised if their true identity is given. Were they working in undercover capacities? Yes. And they were working not only on this case, but on other cases. So not only did the government not want to compromise the ongoing cases, but they also said that they didn't want to compromise future cases. On that same score, I assume that that is a valid reason for not having them disclose their names at trial. So I'll assume that for purposes of my question. Why would the government not turn the true name over to the defense so the defense could do its own investigation? There are times when the government by mistake, human beings make mistakes, don't turn over everything that's out there because they don't know that something's out there and the defense figures it out because it does its own investigation. Why would the defense not get the name under some sort of protective order of the agent's true names? I can't imagine. I just can't. I mean, I'm not a big fan of the government's action in this case. I don't think it was as well thought out as it could have been. We even talked about, in preparing for this case, giving them the name now. My gut reaction is the government just doesn't want to trust the defense with that kind of information because they figure, well, if we give out the name, then that's just one more person who can put it out on the open market. But you could extend that argument to say, well, we don't trust them with the underlying evidence either, so we won't give that to them. Like I said, this isn't the kind of practice I would like to see done in these kind of cases, but again, this is a moot question here. This is an academic argument. This was invited error. Your law says that you can't even review cases where it's invited error. And to the extent that we're talking about why didn't the defense have... Who invited that error? The defense attorney because she said, we don't care if they testify as an alias. He can testify in front of the jury as an alias. We just want his name for the record. Right. So the testimony without the real name may have been invited or may have been waived, but not the disclosure of the name to the defense. Let's talk about that then. The concern in this particular case is purely hypothetical. Because even if he lies in the future on another case, it's not going to make any difference to this case. But what if he had lied before? What if this agent... So I'm going to play out the parade of horribles. So what if this agent had lied before, had been the subject of an internal affairs investigation that found some level of misconduct, right? And the government, by mistake, no ill will, doesn't turn that over? Two points on that. And then trial goes forward. The defense doesn't get the name, so the defense can't conduct its own investigation. Jury returns a verdict of conviction. Now what? That's a problem for the defense. And for us. For the government as well, and for the court. But first of all, she didn't ask for the name to be on the record so that she could go back and do a search for credibility problems that the agent had in the past. Her concern was strictly prospective. So you're putting in a hypothetical that doesn't apply to this case. Well, I know, because my concerns may not jive with the defense's concerns. The only way that I can answer that is to say that, as we all know, the government is bound by its duties under Brady and Giglio to turn that information over. I know. The problem, Mr. DeRosa, is that although everybody acts most of the time in good faith, both on the defense side, the government side, and the judicial side, people make mistakes. And so there are times when defense lawyers don't do what they're supposed to do, and there are times when the government doesn't do what it's supposed to do, and there are times that judges blow it. And so there are fail-safe mechanisms in the system to try to take care of these potential problems. I'm not here to sanction this procedure. I don't think it was a good idea. My argument is that there was no prejudice to the defendant's substantial rights in this case. What specifically was the district judge told about why the defense wanted the name? The only thing that the district court judge was told why the defense wanted his name is, Your Honor, in case this man lies in the future, we need to be able to know who he is so that we can get that information and then come back to this case and say, you know, he's an incredible witness. That was the only reason that was advanced by the defense. Was there any reason advanced to the district court saying we need to know the name of the undercover agent because we have the right to go back and see what his conduct was in the past that might impact his credibility? No, sir. It was strictly prospective. Nothing about his past conduct. And I think that's important because, like I said, if you have his name and you find out he lies in the future, not going to make any difference to this case because his credibility wasn't at issue in this case. The only thing this agent did in this case was authenticate a tape that spoke for itself. So, again, the prospective reason is purely hypothetical and it's not a reason to overturn this case. I want to say, obviously, if the court has any questions, they can ask, but I did want to say one thing about the last issue, which is the... if you look at the status report in this case, you'll see that the defense attorney met with the Childers, the agent, and he showed her his spreadsheets on, this is how I got the fraud loss figures. And she said, well, I don't really care about your spreadsheet. I want to see the underlying documents. Well, the prosecutor told her the underlying documents that he looked at to do his spreadsheet are all on public Internet sites. Here are the URLs for those public sites. She said, okay, well, it's going to take me some time to look at those. She got three continuances for sentencing. She put it in the status report that she had looked at those public sites. And, in fact, if you look at her sentencing memorandum, she copied out a ton of screen shots of those sites. There was no complaint in the district court that she didn't have access to the same exact information that the government had. I want to make that clear. She used those documents that came from the public sites to cross-examine the witness at sentencing. So there shouldn't be any issue here about the fact that the government somehow didn't turn over backup documents. Those documents were available on public sites, equally accessible to the defense attorney. There are no other questions. Thank you for your time. All right. Thank you very much, Mr. DeRosa. Ms. Golder, you've got three minutes. Thank you. Judge Pryor, what I have in my brief under Mr. Cadena's testimony, the site is Docket Entry 360, pages 125 to 127, where he said to process the loans, the bank would receive a credit package from the broker. They then ran their own credit report. The bank did not verify income or any information other than the borrower's credit score. The loans were based solely on verification of credit score. So that came from Mr. Cadena. What about our suite case that says that even if the victim is negligent, that's not a defense to fraud? There are other cases that say the bank conduct can go beyond negligence to recklessness. And here, I wasn't even trying to argue that the bank was negligent. It entered into a high-risk loan. And it charged more money for that loan because it wasn't verifying any of this. And then for Mr. Cadena, who didn't even process these loans, wasn't involved with any of these loans, to come in and say all this information that the bank didn't look at, didn't verify, really didn't care about is still material to the loan. We wanted to challenge that. But the standard for materiality is whether it's capable of influencing the victim. That's a pretty low standard, isn't it? Yeah, but if the bank's not looking at it and not evaluating it and doesn't care about it, which is basically what the nature of these loans were, we should have been allowed to explore that and bring it out. I'm not trying to argue that the bank was negligent and so it suffered its own fate. That wasn't the argument. The argument was to try to challenge his claims that all of this was material even though the bank didn't care about it because of the nature of the loan. But the testimony that you just quoted to Judge Pryor, doesn't that lay out all the evidence you needed for that argument? That all the bank did was verify credit score, that nothing else really mattered? Doesn't that provide the basis for your argument on materiality to a jury? Yes, except that Mr. Kudena went on further to say that all this stuff is still material even though we didn't look at it or we didn't care about it. He actually testified to it. I know, but on that you could have cross-examined him, right? Because he had already testified that he only looked at credit score. I wasn't allowed to and I argued to the judge. Judge, but he testified to this. I should be allowed to cross on it. I wasn't allowed to. Just to get, because I'm almost out of time. Just a second. An application Anna had won, aren't those... That was my next issue, Judge. You were exactly right. But I'm allowed to finish my question. Aren't those signed under penalty of perjury by the borrower? I don't believe so. In fact, very often the original HUD, the HUD ones the bank uses at the end, very often they're not even signed. The borrower signs them at the closing. They have them sign the loan application at the closing. No, but they still sign it saying that the information that I'm submitting in connection with this loan is true and accurate. Yes, they do. They do that in the application as well, right? They do. So why can't a bank rely on somebody's signature and their attestation that the information that's being presented is in fact true and accurate and honest? I guess they could judge if it was information they care about, but keep in mind these loan applications, it's not like they're tailored for specific loans. It's a standard form that contains... Don't you think they would have cared about this if they had seen multiple applications being made by people that were all getting their money from Mr. Raperine? No, I don't think they cared. I really don't. It looked at credit score. That was it. Couldn't a jury have concluded that the reason that the bank was only looking at credit score was that they were accepting the borrower's statement as to income, cash that he or she was putting up, or the like, and if you assume all of those things are true, then all you need to look is credit score to see if someone is a likely bet to repay the loan. Couldn't a jury have come to that conclusion? Except that in most loans, they verify the source of the down payment, they verify income, they do some sort of income verification. I know, but these were no-verification loans. Which means probably that the borrower doesn't want to disclose those things. Why would you pay more money for a no-verification loan if all of your information can be verified and you qualify for a loan that has a better interest rate and lower fees? They're quicker to process, and a borrower might say it's more important for me to get my mortgage proceeds than it is to go through this regular process where you have to verify everything. But there's no evidence that it was quicker to process. I mean, it still went through a certain verification process with the credit scores. I mean, so they were still processing, and it still got caught up in the bank's bureaucracy. There's nothing to say these loans were processed faster. Okay, Ms. Goldger, we've let you go a little bit beyond your time, and Ms. DeRose as well, because we had questions for you, but we've got to move on to the next case. So we thank you very much for your argument.